12-2207-cr
United States v. Gill

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: November 26, 2013                    Decided: May 7, 2014)

Docket No. 12-2207-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

RICARDO ALVIN GILL,

*Defendant-Appellant.*

_____

Before:

KATZMANN, *Chief Judge*, WINTER, and CALABRESI, *Circuit Judges*.

_____

Defendant-Appellant Gill appeals from a judgment of the United States District Court for the Western District of New York (Skretny, *J.*), denying his motion to dismiss the indictment for illegal reentry in violation of 8 U.S.C. § 1326(a), (b)(2).  For the reasons stated below, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.

JOSEPH J. KARASZEWSKI, Assistant United States Attorney, for William J. Hochul, United States Attorney, Western District of New York, Buffalo, NY, *for Appellee*.

MICHAEL J. STACHOWSKI, Buffalo, NY, *for Defendant-Appellant*.

_____

KATZMANN, *Chief Judge*:

This case requires us to decide whether the petitioner Ricardo Allen Gill can sustain a collateral challenge to his order of deportation, which is a defense to a prosecution for illegal reentry in violation of 8 U.S.C. § 1326(a), (b)(2). The resolution of this question turns on whether the Supreme Court's ruling in *Vartelas v. Holder*, 132 S.Ct. 1479 (2012), requires us to find that Gill is eligible for relief from deportation under former section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994), ("§ 212(c)"). Prior to 1996, § 212(c) provided many noncitizens convicted of aggravated felonies with the opportunity to seek relief from deportation. The repeal of § 212(c) in 1996 effectively eliminated statutorily-provided discretionary relief from deportation for this class of noncitizens. *See Rankine v. Reno*, 319 F.3d 93, 96 (2d Cir. 2003). Because the rescission of such relief affected an immense number of people, there has been a considerable amount of litigation to determine whether § 212(c) relief

2

remains available to noncitizens who were once eligible for this form of relief. In the instant appeal, we must consider whether Congress's repeal of § 212 would have an impermissible retroactive effect if applied to foreclose such relief to noncitizens like Gill who, prior to the date of § 212(c)'s repeal, were convicted of aggravated felonies after proceeding to trial. In *Rankine*, we held that deeming the petitioners ineligible for § 212(c) relief on the basis of pre-repeal convictions obtained after trial not would have an impermissibly retroactive effect because the petitioners in that case had not "detrimentally rel[ied] on the availability of discretionary relief when exercising their right to trial." *Id*. at 95. However, we conclude that, in light of *Vartelas*, *Rankine* is no longer good law in that respect. We now hold that deeming noncitizens like Gill ineligible for § 212(c) relief merely because they were convicted after trial would have an impermissible retroactive effect because it would impermissibly attach new legal consequences to convictions that pre-date the repeal of § 212(c). Because Gill was erroneously found to be ineligible for relief under § 212(c), we find that the district court erred, and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

Gill, a native and citizen of Barbados, came to the United States on a B-2 visa in or about 1972 with his parents, three brothers, and three sisters. At that point, he was approximately five years old. While he was growing up, he went to school in the Bronx and had various jobs. He eventually became a lawful permanent resident on January 6, 1984, and his parents and siblings became lawful permanent residents as well.

In or around 1986, Gill began using crack cocaine and committing crimes— largely theft-related—to support his habit. As a result, he was prosecuted and pleaded guilty to several related offenses including, as relevant to this case, a 1989 conviction for attempted criminal sale of a controlled substance in the third degree in violation of New York Penal Law §§ 110 and 220.39. While serving his sentence, Gill got treatment for his drug addiction and became sober. However, because of Gill's conviction for attempted sale of a controlled substance, which is considered an aggravated felony under immigration law, immigration

authorities (then called the Immigration and Naturalization Service ("INS"))[1]

initiated deportation proceedings against him on July 16, 1990.

In 1991, Gill met Michelle McNeal, a United States citizen, and they

married in 1993.  She was pregnant when they met and together they raised her

son, Randy Hinkston ("Randy").  Gill worked a steady job and paid for McNeal's

tuition as she pursued her nursing degree, as well as the costs of raising her son,

whom Gill treated as his own.

At his November 1992 hearing in immigration court, Gill conceded that he

was deportable and applied for a waiver of deportation under § 212(c). [2]  While

his immigration case was pending, Gill was convicted after trial of attempted

robbery in the first degree in violation of New York Penal Law §§ 110 and 160.15

(the "1995 conviction"), which is also considered to be an aggravated felony.

According to Gill's testimony about that conviction at his immigration hearing,

---

[1] The INS ceased to exist on March 1, 2003, and its immigration enforcement functions were transferred to the Department of Homeland Security ("DHS") pursuant to the Homeland Security Act of 2002, Pub. L. No. 107–296, § 402, 116 Stat. 2135, 2178 (Nov. 25, 2002).  *See Dobrova v. Holder*, 607 F.3d 297, 299 n. 1 (2d Cir. 2010).

[2] Gill's immigration case has a more extensive history, but it is not relevant to the issues on appeal.  In brief, Gill was initially found ineligible for § 212(c) relief based on insufficient physical presence in the United States.  He appealed that decision and the Board of Immigration Appeals ("BIA") reversed and remanded the case.  He was then ordered deported in absentia when he was stuck in the security line outside while trying to get into the building for his hearing.  He appealed and the BIA reversed that deportation order as well.

his charge was based on the theory that he had aided and abetted a co-defendant who had committed the robbery.

## II. Deportation Proceedings

Gill's merits hearing in his immigration case took place before an immigration judge ("IJ") on January 8, 1997, while he was serving his sentence for attempted robbery. Gill, his wife, his brother, his niece, and his mother testified about the important role that Gill played as a father to Randy, the presence of Gill's extended family in the United States, his work history, the fact that he had paid taxes, and his criminal convictions. His wife testified that Gill had paid for all of Randy's expenses and her tuition to pursue her nursing degree. The IJ reserved decision, noting that Gill had strong family support and had "done an awful lot to help [him]self" in becoming drug-free, but also had a significant criminal history, App'x 142. The IJ indicated that he was undecided at the conclusion of the hearing.

On January 27, 1997, the IJ denied Gill's application for § 212(c) relief as a matter of discretion. In a written decision, the IJ noted Gill's strong family ties, but concluded that Gill's equities were insufficient to overcome his "serious,

6

recent, and severe" criminal record. App'x 157. Accordingly, he ordered Gill deported.

Gill appealed to the BIA on February 26, 1997. The INS's Assistant District Counsel of the New York District submitted a letter-brief asking the BIA to dismiss the appeal on the ground that Gill was statutorily ineligible for relief because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 440(d) 110 Stat. 1214, 1277-78, made noncitizens with aggravated felony convictions (like Gill) ineligible for § 212(c) relief. In that letter-brief, the INS argued that AEDPA applied to all cases that were pending when AEDPA went into effect. The BIA dismissed Gill's appeal on that basis in a single-member, per curiam order dated August 21, 1997. The BIA did not reach the merits of Gill's appeal, which challenged the IJ's discretionary denial of § 212(c) relief. Gill did not seek habeas review and was deported to Barbados on April 23, 2004, after serving his sentence for the 1995 conviction.

### III. Reentry Charge and Motion to Reopen

Gill returned to the United States without authorization in approximately 2007. Until 2010, he maintained a residence in Buffalo, New York, and a steady job as a residential maintenance worker. He has had no other convictions since

1995.  On January 5, 2010, he was taken into custody by DHS officers for being unlawfully present in the United States.  On September 7, 2010, he was indicted for illegal reentry in violation of 8 U.S.C.  § 1326 (a), (b)(2), the offense which is the subject of the instant appeal.

On April 29, 2010, Gill moved the BIA to reopen his deportation proceedings.  His motion to reopen was based on *INS v. St. Cyr*, 533 U.S. 289 (2001), a decision that post-dated his order of deportation, which held that § 212(c) relief remained available to noncitizens "whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect," *id.* at 326.   Gill argued that the BIA had dismissed his appeal based on an erroneous finding that he was ineligible for § 212(c) relief, and therefore he had been denied meaningful administrative and judicial review of the IJ's decision.  He acknowledged that his motion was untimely, but sought equitable tolling since *St. Cyr* was not decided until well after the time limit for filing a motion to reopen had passed.  He also sought *sua sponte* reopening as a matter of discretion.

On May 20, 2010, the BIA denied the motion for three reasons. First, it held that it lacked jurisdiction to reopen deportation proceedings under the so-called "departure bar" because Gill had already departed the United States. App'x 166 (citing 8 C.F.R. § 1003.2(d), and *Matter of Armendarez-Mendez*, 24 I. & N. Dec. 646 (BIA 2008)). Second, the BIA found that "in any event, [under 8 CFR § 1003.44(h)] a special motion seeking relief under section 212(c) of the Act had to be filed by April 26, 2005." App'x 167.[3] Third, the BIA refused to reopen proceedings *sua sponte*, ruling that the departure bar divested it of jurisdiction to reopen the proceedings *sua sponte* and that it would not exercise its discretionary authority to reopen even if it had such authority.

Gill petitioned this Court for review of the BIA's denial, and on September 22, 2010, we affirmed the BIA's decision in all respects, dismissing Gill's petition as "lack[ing] an arguable basis in law or fact." App'x 168. We found that "[t]he BIA did not abuse its discretion in denying petitioner's motion to reconsider because the motion was untimely and [he] failed to demonstrate due diligence to

---

[3] 8 CFR § 1003.44(h) sets forth procedures for seeking § 212(c) relief following *St. Cyr* and provides a deadline of April 26, 2005, for filing such motions.

9

warrant equitable tolling." App'x 168.[4]  Gill moved for reconsideration of this

decision, but we denied that motion as well.

Gill then responded to the criminal illegal reentry charge by collaterally

challenging the deportation order.  He moved to dismiss the indictment

pursuant to 8 U.S.C. § 1326(d), arguing that he was denied meaningful review of

his request for § 212(c) relief.  Under 8 U.S.C. § 1326(d), defendants may

challenge deportation orders by establishing: (1) exhaustion of any

administrative remedies that may have been available to seek relief from a

deportation order; (2) that the noncitizen was deprived of judicial review during

his deportation proceedings; and (3) that the entry of the deportation order was

fundamentally unfair.

The magistrate judge handling pretrial matters found that Gill had not

established the second or third requirement of § 1326(d) and therefore

recommended that Gill's motion be denied.  Specifically, he found that Gill failed

to establish the second prong—deprivation of the opportunity for judicial

---

[4] In so finding, we relied upon the departure bar rule.  Subsequently, in 2011, we rejected the departure bar rule as applied to statutory motions to reopen.  *See Luna v. Holder*, 637 F.3d 85, 102 (2d Cir. 2011)  ("Because the BIA's departure bar regulation 'has no roots in any statutory source and misapprehends the authority delegated to the Board by Congress,' the BIA must consider an alien's motion to reopen even if the alien is no longer in the United States." (quoting *Pruidze v. Holder*, 632 F.3d 234, 235 (6th Cir. 2011))).

review—because Gill never sought habeas review of his deportation order. As for the third prong, the magistrate judge found that Gill had not shown that the entry of his deportation order was fundamentally unfair because there was no error in the proceedings: the BIA correctly found that Gill was ineligible for § 212(c) relief since he was convicted at trial rather than after a guilty plea. Over Gill's objections, the district court adopted the magistrate judge's recommendation and denied Gill's motion to dismiss the indictment.

On February 16, 2012, Gill pleaded guilty to the illegal reentry charge, specifically reserving his right pursuant to Federal Rule of Criminal Procedure 11(a)(2) to bring the instant appeal. Judgment was entered on May 25, 2012, and Gill was sentenced to time served and one year of supervised release. This appeal followed.

## STANDARD OF REVIEW

"We review *de novo* the district court's denial of [a defendant's] motion to dismiss the indictment on the basis of a collateral attack on his deportation order under § 1326(d)." *United States v. Lopez*, 445 F.3d 90, 94 (2d Cir. 2006); *accord United States v. Gonzalez-Roque*, 301 F.3d 39, 45 (2d Cir. 2002) ("Because it entails mixed questions of law and fact, we review *de novo* the District Court's dismissal

11

of the [§ 1326(a), (b)(2)] indictment." (quoting *United States v. Fernandez-Antonia*, 278 F.3d 150, 156 (2d Cir. 2002)) (internal citations omitted)).

**DISCUSSION**

"[I]t is well settled that the procedures employed [in deportation or removal hearings] must satisfy due process. . . . Consequently a defendant may collaterally attack an order of deportation on due process grounds where, as here, the order becomes an element of a criminal offense." *Gonzalez-Roque*, 301 F.3d at 45 (internal quotation marks omitted). The mechanism for collaterally attacking a deportation order that forms the basis of a criminal offense is set forth in 8 U.S.C. § 1326(d), which permits a noncitizen charged with illegal reentry under 8 U.S.C. § 1326(a), (b)(2) to challenge the underlying deportation order on which the illegal reentry charge is based. *Id.* at 45.

In order to successfully challenge a deportation order under § 1326(d), a defendant must demonstrate that:

> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).

12

The district court found that Gill had fulfilled the first requirement of 8 U.S.C. § 1326(d)—exhaustion of administrative remedies—because he had appealed his deportation order to the BIA.  However, it denied Gill's motion to dismiss the reentry charge because, in its view, Gill had not fulfilled the second and third requirements of 8 U.S.C. § 1326(d).  These two conclusions are the bases for the instant appeal.

On appeal, Gill argues that the district court erred in concluding that, because Gill did not file a habeas petition, he cannot establish that he was deprived of judicial review of his deportation order.  He maintains that he had no realistic opportunity to seek judicial review because he was misinformed by the BIA that he was ineligible for relief.[5]  He argues that he was indeed eligible for relief, a fact which *Vartelas* makes clear, and consequently he was unfairly deprived of any realistic possibility of seeking judicial review.  In this same vein, he contends that the entry of his deportation order was fundamentally unfair because he was deemed ineligible for a form of relief for which, under *Vartelas*, he is eligible.

---

[5] It is unclear whether Gill intends to argue that he received incorrect information or ineffective counsel from his attorneys in this respect or that such counsel, if it was ineffective, extinguished any realistic opportunity for judicial review.

For the reasons set forth below, we agree with Gill and join several of our sister circuits in holding that, under *Vartelas*, noncitizens in Gill's position are not rendered ineligible for § 212(c) relief on the basis of convictions that pre-date the repeal of § 212(c) simply because the conviction was trial-based.  Accordingly, since the district court's  erroneous view of the law in this respect served as the linchpin to its § 1326(d) analysis, we must remand for further factfinding to determine whether it was realistically possible for Gill to challenge his deportation order through a habeas petition and whether the entry of Gill's deportation order was fundamentally unfair.

## I.  Retroactivity Analysis and § 212(c) relief

Gill's arguments hinge on the availability of § 212(c) relief for noncitizens who were eligible for such relief but, prior to the 1996 congressional repeal of § 212(c), were convicted of an aggravated felony after trial.  Because the elimination of § 212(c) relief affected a large number of people, there has been a considerable amount of litigation to determine who remains eligible for this form of relief.  As a result, there have been significant shifts in the law governing the continuing availability of this relief for individuals who would have been eligible for § 212(c) relief prior to § 212(c)'s repeal.  All of these shifts occurred after Gill's

14

convictions became final and after he applied for § 212(c) relief. Some of them occurred before his final order of deportation was entered. Since the current state of the law is critical to resolving Gill's arguments on appeal, we briefly trace the developments in the law on this issue.

## A. Continuing Availability of § 212(c) Relief

Prior to 1996, many noncitizens with criminal convictions could seek a discretionary waiver of deportation under § 212(c). This form of relief could be granted, in the discretion of the Attorney General, to noncitizens who could show that they were lawful permanent residents, had accrued seven consecutive years of "lawful unrelinquished domicile," and had not been convicted of an aggravated felony for which they had served a term of at least five years. *See* 8 U.S.C. § 1182(c) (1994).

In the early and mid-1990s, Congress limited the classes of noncitizens eligible for this form of discretionary relief and then eliminated this type of relief altogether. In 1990, Congress amended § 212(c) to preclude from discretionary relief anyone who had served an aggregate term of imprisonment of at least five years as a result of one or more aggravated felony convictions. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 511, 104 Stat. 4978, 5052 (amending 8 U.S.C.

§ 1182(c)).  In April 1996, Congress enacted AEDPA, which further limited

eligibility for relief under § 212(c) by making those convicted of "aggravated

felonies," among others, ineligible for such relief.  AEDPA, § 440(d) (amending 8

U.S.C. § 1182(c)).   In September 1996, Congress passed the Illegal Immigration

Reform and Immigrant Responsibility Act ("IIRIRA"), which repealed § 212(c) in

its entirety, Pub. L. No. 104–208, Div. C, § 304(b), 110 Stat. 3009, 3009–597

(amending 8 U.S.C. § 1182(c)), thereby eliminating discretionary relief from

deportation that was previously available to noncitizens convicted of aggravated

felonies.  *See St. Cyr*, 533 U.S. at 297.[6]

Since the enactments of AEDPA and IIRIRA, we and other courts have

been called upon to determine the retroactive reach of these statutes.   In this

endeavor, we are guided by *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the

touchstone case regarding statutory retroactivity.  *Landgraf* sets forth a two-step

test to determine whether a law should apply to conduct that occurred prior to

the law's enactment: we must (1) consider whether Congress "expressly

prescribed the statute's proper reach," and, if it did not, (2) "determine whether

---

[6]  Although relief based on the probability of persecution, *see* 8 C.F.R. §§ 208.16, 1208.16, or torture, *see* 8 C.F.R. §§ 208.17, 1208.17, in a person's home country may be available to noncitizens with aggravated felonies, *see Matter of Jean*, 23 I. & N. Dec. 373, 376 n.1 (Op. Att'y Gen. 2002), such relief is not available to the many noncitizens who do not fear persecution in their home countries.

the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. The Supreme Court has made clear that, in enacting the applicable provisions of AEDPA and IIRIRA, "Congress did not definitively decide the issue of [their] retroactive application to pre-enactment convictions." *St. Cyr v. INS*, 229 F.3d 406, 414-15 (2d Cir. 2000). Therefore, we must decide whether these statutes would have impermissible retroactive effect under the second step of the *Landgraf* retroactivity analysis.

Immediately after the passage of AEDPA, the BIA held that § 440(d) of AEDPA applied retroactively to all pending applications for § 212(c) relief , even if the criminal conviction occurred before AEDPA was enacted and even if the applicant's removal proceedings were initiated prior to AEDPA's enactment. *See Matter of Soriano*, 21 I. & N. Dec. 516, 518-21 (BIA 1996; Op. Att'y Gen. 1997). However, it also held that § 440(d) did not apply retroactively to noncitizens who, like Gill, had applied for § 212(c) relief before AEDPA was enacted. *Id*. On February 21, 1997, the Attorney General vacated the BIA's opinion and concluded that § 440(d) applied to all noncitizens who had not been granted

§ 212(c) relief before AEDPA's enactment, including those whose § 212(c) relief applications were pending at the time that AEDPA was passed. *Id*. at 533. Accordingly, the BIA henceforth took the position that noncitizens could not seek § 212(c) relief, "regardless of the date of the crime, conviction, deportation proceedings, or application for section § 212(c) relief." Executive Office for Immigration Review, *Section § 212(c) Relief for Certain Aliens in Deportation Proceedings Before April 24, 1996*, 66 Fed. Reg. 6,436, 6,437 (Jan. 22, 2001). This interpretation left Gill and many others who had counted on such relief without recourse, and "g[ave] rise to widespread litigation in nearly every circuit," *id*.

In *St. Cyr*, this Court disagreed with the Attorney General's interpretation, rejecting the notion that AEDPA applied retroactively in that case in which the noncitizen had chosen to plead guilty to a crime that would have left him eligible for § 212(c) relief prior to § 212(c)'s repeal. *St. Cyr*, 229 F.3d at 421. Applying the second step of the *Landgraf* analysis, we found it relevant that noncitizens might have relied "on the possibility of receiving a waiver of deportation" under § 212(c) when they entered their pleas. *Id.* at 419. We further noted that "[a] 'legal change that would have an impact on private parties' planning' triggers the presumption against retroactivity," *id*. at 418 (quoting *Landgraf*, 511 U.S. at

18

281-82), and reasoned that the rescission of § 212(c) relief would change noncitizen defendants' planning given the well-documented fact that "an alien charged with a crime [making him deportable] would factor the immigration consequences of conviction in deciding whether to plead *or proceed to trial*," *St. Cyr*, 229 F.3d at 418 (quoting *Tasios v. Reno*, 204 F.3d 544, 552 (4th Cir. 2000)) (brackets in original) (emphasis added).

The Supreme Court affirmed. *St. Cyr*, 533 U.S. at 326. It began by noting the "deeply rooted" presumption against retroactive legislation, *id*. at 316 (internal quotation marks omitted), and the "special concerns" it raises, *id*. at 315. It noted that two legal consequences resulted from St. Cyr's conviction: (1) he became deportable and (ii) he became eligible for § 212(c) relief. *Id.* at 314-15. Among the relevant considerations, it noted that, "[g]iven the frequency with which § 212(c) relief was granted in the years leading up to AEDPA and IIRIRA, preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *Id*. at 323 (footnote omitted). And, the Court observed that noncitizen defendants considering whether to plead or proceed to trial are "acutely aware of the immigration consequences of their convictions." *Id*. at 322.

Ultimately, it focused on the "significant and manifest" "potential for unfairness" in applying the retroactive repeal to the cases of people who may have relied on "settled practice, the advice of counsel, and perhaps even assurances in open court that the entry of the plea would not foreclose § 212(c) relief." *Id*. at 323. Based on these factors, it concluded that "it would surely be contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations,'" to find that the statute retroactively forecloses any possibility of relief. *Id*. at 323-24 (quoting *Landgraf*, 511 U.S. at 270).

In the years that followed, we were asked to apply *St. Cyr*'s retroactivity holding in the case of a noncitizen who had been convicted after trial rather than through a guilty plea. In *Rankine v. Reno*, we considered whether "the fact that the petitioners were convicted after trial dictate[s] a different conclusion on the retroactive effect of IIRIRA than that reached in *St. Cyr*, where the petitioners had pled guilty[.]" 319 F.3d at 98. We found that it did because we could not "conclude, as we must to find impermissible retroactivity, that the petitioners chose to go to trial in reliance on the availability of § 212(c) relief." *Id*. at 100. In so doing, we reasoned that, "[u]nlike aliens who entered pleas, the petitioners [who were found guilty after trial] made no decision to abandon any rights and

20

admit guilt . . . in reliance on the availability of the relief offered prior to"

§ 212(c)'s repeal. *Id.* at 99. Specifically, we found that "none of these petitioners

detrimentally changed his position in reliance on continued eligibility for § 212(c)

relief," nor pointed to "conduct on their part that reflects an intention to preserve

their eligibility for relief under § 212(c) by going to trial," like "participat[ion] in

the *quid pro quo* relationship" of plea bargaining. *Id*. at 99-100. "As the

[Supreme] Court made clear," we opined, "it was that reliance, and the

consequent change of immigration status, that produced the impermissible

retroactive effect of IIRIRA." *Id*. at 100. Thus, we found that, because the

petitioners could not show reliance, "the repeal of [§ 212(c)] relief does not have

an impermissibly retroactive effect when applied to" noncitizens "who were

convicted at trial rather than pursuant to a plea." *Id*. at 102.

### B. *Vartelas v. Holder*

We built upon our reliance-focused retroactivity analysis when we decided

*Vartelas v. Holder*, 620 F.3d 108 (2d Cir. 2010). That case hinged on the retroactive

application of 8 U.S.C. § 1101(a)(13)(C)(v), a statutory provision enacted as part

of IIRIRA that requires noncitizens with lawful status in the United States to

reapply for admission when returning from a trip abroad. When returning from

a brief trip to Greece to visit to his aging parents in 2003, Vartelas was required to reapply for admission under § 1101(a)(13)(C)(v), and was denied admission because of a pre-1996 criminal conviction that rendered him inadmissible. *Id.* at 111. We held that Vartelas could be required to apply for admission under IIRIRA even though he had been convicted of the crime before the statute's enactment. *Id.* at 121. In other words, we held that the statute applied retroactively, thereby attaching IIRIRA's requirements to Vartelas's pre-IIRIRA conviction. Given that our past precedents had "consistently rejected the notion that an alien can reasonably have relied on provisions of the immigration laws in 'committ[ing]' his crimes," *id.* at 120 (quoting § 1101(a)(13)(C)(v)), we reasoned that applying § 1101(a)(13)(C)(v) retroactively to a conviction that pre-dated IIRIRA was permissible, *Vartelas*, 620 F.3d at 119–21. In so holding, we recognized that we created a circuit split, rejecting the Fourth Circuit's holding in *Olatunji v. Ashcroft*, 387 F.3d 383, 389-91 (4th Cir. 2004), that "reliance plays no role whatever in the retroactivity analysis" as contrary to our understanding of the Supreme Court's decision in *St. Cyr*. *See Vartelas*, 620 F.3d at 121.

The Supreme Court reversed in *Vartelas v. Holder*, 132 S. Ct. 1479, 1484 (2012). After noting the presumption against retroactive legislation, and the fact

22

that IIRIRA contained no unambiguous statutory directive regarding retroactive application, the Court proceeded to the second *Landgraf* step, asking whether the application of IIRIRA to Vartelas's case "'would have retroactive effect that Congress did not authorize." *Id*. at 1487 (quoting *Landgraf*, 511 U.S. at 280). Ultimately, the Court refused to apply § 101(a)(13)(C)(v) retroactively because doing so would attach "a new disability" to Vartelas's conviction by "block[ing] him from occasional visits to his parents in Greece." *Vartela*s, 132 S. Ct. at 1487.

In reversing our precedent, the Supreme Court expressly rejected our conclusion that Vartelas could not demonstrate that the statute had an impermissible retroactive effect because he could not show actual reliance on prior law. *Id*. at 1490. First, it rejected our holding that reliance on prior law is "essential to application of the antiretroactivity principle," *id*. at 1491; expressly approving of *Olatunji*, it pointed out that "the presumption against retroactive application of statutes does not require a showing of detrimental reliance." *Id*. at 1491. Second, it explained, to the extent that "reasonable reliance" is relevant, it is simply one of several "'familiar considerations' animating [the antiretroactivity] presumption." *Id*. at 1491 (quoting *Landgraf*, 511 U.S. at 270) (noting that fair notice and settled expectations are among the other factors). The

23

Supreme Court went on to point out that, in any event, Vartelas "likely relied on then-existing immigration law" because he pleaded guilty before the enactment of § 1101(a)(13)(C)(v). *Vartelas*, 132 S. Ct. at 1491. The Court clarified that the essential inquiry is *not* whether there is reliance, but instead "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 1491 (quoting *Landgraf*, 511 U.S. at 269–70).

*Vartelas*'s retroactivity analysis—in particular its discussion of reliance interests—thus compels us to reevaluate our prior retroactivity analyses that focused on reliance interests. In the instant case, it requires us to find that *Rankine*'s holding, as least as it relates to convictions obtained after trial, has been implicitly overruled.[7] We do not make such a finding lightly but, for the reasons explained below, we must join the weight of post-*Vartelas* precedent on this issue in finding that prior *Rankine*-aligned precedents have been overruled by *Vartelas*.[8]

---

[7] We express no view on the continuing viability of other propositions supported by *Rankine*. Accordingly, our discussion of *Rankine* in the remainder of this opinion is limited to its holding on whether IIRIRA's repeal of § 212(c) applies to trial-based, pre-IIRIRA convictions.

[8] In our Circuit, panels are "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). "However, if 'there has been an intervening Supreme Court decision that casts doubt on our controlling precedent,' one panel of this Court may overrule a prior decision of another panel. The intervening decision need not address the precise issue decided by the panel for this exception to

We are convinced that *Vartelas* implicitly overruled *Rankine* in two important ways. First, *Vartelas* explicitly rejected our subjective-reliance-focused analysis, *id.* at 1490-91, which was the basis for *Rankine*'s holding, *see Rankine*, 319 F.3d at 102. Second, *Vartelas* implicitly rejected the notion that interpreting the repeal of § 212(c) to apply retroactively would not "attach new legal consequences" to trial-based convictions, *Vartelas*, 132 S. Ct. at 1491. The *Vartelas* opinion evinced this implicit rejection in the Third Circuit case it cited in clarifying the proper retroactivity analysis. Specifically, in describing the "operative presumption"of nonretroactivity, *id*. at 1491, it approvingly quoted *Ponnapula v. Ashcroft*, 373 F.3d 480 (3d Cir. 2004), which held that, irrespective of reliance, § 212(c) relief remains available to noncitizens who declined plea agreements and elected to go to trial, *id*. at 493. And we cannot ignore the fact that neither *Vartelas* nor *St. Cyr* limited their holdings to convictions obtained after a plea.[9] On the contrary, the language of both cases is inclusive, referencing the fact that noncitizens have long factored relief options into their decision to plead or go to trial. *See Vartelas*, 132 S. Ct. at 1492 n.9 (recognizing that defense

apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (quoting *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004)).

[9] Since guilty pleas "account for nearly 95% of all criminal convictions," *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010), we do not find the fact that both cases happen to involve convictions obtained through guilty pleas to be particularly significant.

25

attorneys must counsel their clients as to immigration consequences when the client is deciding whether to plead guilty or go to trial); *St. Cyr*, 533 U.S. at 322 n.48 (noting that "the American Bar Association's Standards for Criminal Justice provide that, if a defendant will face deportation as a result of a conviction, defense counsel 'should fully advise the defendant of these consequences'" (quoting 3 *Am. Bar Ass'n, Standards for Criminal Justice* 14–3.2 cmt., 75 (2d ed. 1982))).

Considering the repeal of § 212(c) in light of *Vartelas*, we find that applying it retroactively to convictions like Gill's would impermissibly impose new legal consequences on those convictions. Before the passage of AEDPA, Gill was eligible for § 212(c) relief, which gave him the opportunity to remain with his family in the United States, where he has lived for more than thirty years; afterwards, he was not eligible for this relief. This legal consequence, like that faced by Vartelas, is especially significant given the dearth of other options to avoid deportation and the near impossibility of returning to the United States afterward. *See Cardenas–Delgado v. Holder*, 720 F.3d 1111, 1121 (9th Cir. 2013) (finding that the change in eligibility for § 212(c) relief is a legally significant consequence); *accord Carranza–De Salinas v. Holder*, 700 F.3d 768, 774 (5th Cir.

2012).   Since this legal consequence is the same regardless of whether the conviction was obtained by trial or plea, we see no logical reason for distinguishing between the two.

Our reading of *Vartelas* is bolstered by the fact that the Fifth and Ninth Circuits have concluded that their own *Rankine*-like precedents were overruled by *Vartelas*, thus joining the Third, Eighth, and Tenth Circuits in holding that § 212(c) relief is available under *St. Cyr* for noncitizens with trial-based convictions without requiring those noncitizens to show subjective reliance.  *See Cardenas*, 720 F.3d at 1120 (finding it "unreasonable to conclude that the Supreme Court did not intend for the principles it articulated in *Vartelas* to apply in the context of determining whether the repeal of § 212(c) relief may be applied retroactively to an aggravated felon such as Cardenas–Delgado [who was convicted after trial]"); *accord Carranza–De Salinas*, 700 F.3d at 774.[10]   In addition, in a recent precedential opinion, the BIA agreed.  *See Matter of Abdelghany*, 26 I. & N. Dec. 254, 268 (2014) ("[W]e are convinced that Supreme Court and emerging circuit court precedent has superceded the regulatory prohibition against

---

[10] *See Lovan v. Holder*, 574 F.3d 990, 993-94 (8th Cir. 2009) (holding that no showing of reliance is required); *Atkinson v. Att'y Gen. of the United States.*, 479 F.3d 222, 230 (3d Cir. 2007) (same); *see also Hem v. Maurer*, 458 F.3d 1185, 1195-97 (10th Cir. 2006) (rejecting *Rankine*'s actual reliance requirement in favor of an objective reliance standard).

27

granting [§] 212(c) relief under *St. Cyr* to aliens convicted after trial."); *see also*

*Zivkovic v. Holder*, 724 F.3d 894, 903 (7th Cir. 2013) (acknowledging that *Vartelas*

raises this question, but "sav[ing resolution of the question] for another day").

Moreover, there is no precedent of which we are aware that conflicts with

our understanding of *Vartelas*'s impact on *Rankine*-aligned precedents.[11]  Only the

Eleventh Circuit, in an unpublished decision, has found that *Vartelas* does not

affect its retroactivity analysis with respect to § 212(c) relief.  *See Acebo-Leyva v.*

*U.S. Atty. Gen.*, No. 13-11008, 537 F. App'x 875, 877 (11th Cir. 2013) (per curiam)

(unpublished) (reasoning only that *Vartelas* concerned a different statutory

provision than was at issue in *St. Cyr* and therefore it was bound to follow prior

Eleventh Circuit precedent that aligned with *Rankine*).

Our holding today is also consistent with the "commonsense, functional"

view that we must take in our retroactivity determination, *Martin v. Hadix*, 527

U.S. 343, 357 (1999), because it reflects the practical reality of noncitizens who

were facing a choice between pleading and going to trial.  For a defendant who

maintained his innocence and exercised his right to trial, it might have been

rational to do so if he knew that a conviction for the top charge of an indictment

---

[11] *Cf. Zivkovic*, 724 F.3d at 903 (distinguishing Zivkovic's "unusual situation" and declining to decide whether its reliance-focused retroactivity analysis was affected by *Vartelas*).

28

would leave some opportunity to seek relief in immigration court.  However, if that same defendant knew he would have no option for seeking relief if convicted of the top charge of the indictment, he might have chosen to negotiate a plea agreement rather than risk exile from his friends and family.  In fact, this type of reliance is exactly what Gill argues in the instant case.  Alternatively, as the *Carranza–De Salinas* court explained, a defendant may have gone to trial and forgone her chance to appeal on the understanding that her conviction and sentence preserved the option of § 212(c) relief.  700 F.3d at 774. [12]

To the extent that reliance plays any role on our decision today, we find that it weighs in Gill's favor.  As explained above, the signals we believed that *St. Cyr* sent about the distinct position of noncitizens who chose to go to trial, *see Rankine*, 319 F.3d at 100, have been clarified in subsequent Supreme Court

---

[12] The Fifth Circuit explained the options that had been available to the petitioner:

> Aliens in [the petitioner's] position—those who declined a plea agreement and went to trial—could instead have negotiated to plead guilty to a nonexcludable offense. Alternatively, an alien in [the petitioner's] shoes who decided not to appeal might have chosen not to do so because [the petitioner] had been sentenced to five years or fewer in prison, which, under pre-IIRIRA rules, would allow [the petitioner] to remain eligible for discretionary relief under § 212.

*Id*. at 774.

precedent that indicates that there is a likelihood of reliance even for noncitizens who decide to proceed to trial. *See Vartelas*, 132. S.Ct. 1491 n.9; *Padilla*, 559 U.S. at 366. Since defense counsel have long been attuned to these concerns and the importance of helping their clients make choices to avoid such consequences, *see Vartelas*, 132. S.Ct. 1491 n.9; *Padilla*, 559 U.S. at 367-68; *St. Cyr*, 533 U.S. at 322, 322 n.48, we think that it is more than likely that noncitizens in Gill's position would have relied on this form of relief.

For these reasons, we find that the repeal of § 212(c) relief would be impermissibly retroactive if applied to pre-IIRIRA convictions, regardless of whether those convictions were obtained after a guilty plea or a trial. Our holding today thus affects the resolution of both of the deficiencies that the district court identified in rejecting Gill's motion to dismiss. We discuss each in turn.

## II. Deprivation of Judicial Review

First, the district court found that, because Gill did not challenge the BIA's order by filing a habeas petition under 28 U.S.C. § 2241, he cannot establish that he was denied the opportunity for judicial review. Challenging this finding on appeal, Gill argues that seeking habeas relief was not "'realistically possible,'"

30

because the BIA had misinformed him that he was not eligible for § 212(c) relief. Defendant-Appellant's Br. at 18 (quoting *United States v. Copeland*, 376 F.3d 61, 68 (2d Cir. 2004)).  He also asserts that he was misinformed by his attorneys that there were no other options for seeking judicial review.  *See* Defendant-Appellant's Br. at 18; *see also United States v. Gill*, 10-cr-2605, Dkt. 79 at 6 (S.D.N.Y. May 31, 2011)  (Gill's counsel explaining that, after the Second Circuit denied Gill's previous petition for review, Gill "c[ouldn't] go any further" in challenging his deportation order).

In reviewing cases involving collateral attacks under § 1326(d)(2), we have held that the failure to seek habeas review may prevent a noncitizen from establishing that he was denied judicial review.  *Gonzales-Roque*, 301 F.3d at 49–50.  However, we have also recognized that, notwithstanding the failure to seek habeas review, a noncitizen may be able to satisfy § 1326(d)(2)'s requirement if "no realistic opportunity for judicial review by way of habeas review existed." *Copeland*, 376 F.3d at 68.

Applying these principles in *United States v. Lopez*, we reviewed a § 1326(d)(2) claim in which the noncitizen had, like Gill, been informed by the BIA that he was ineligible for § 212(c) relief because of the retroactive application

31

of AEDPA, and therefore he had not sought habeas review to challenge his order of deportation. *Lopez*, 445 F.3d at 92–93. We held that seeking habeas review was not realistically possible when the noncitizen "[was] misled by [the agency] about the availability of relief from deportation." *Id*. at 98. We reasoned that, "[w]hile the interval of time in which it is realistically possible for an alien seek judicial review may be quite short where the alien has not received misinformation, the analysis differs where the government affirmatively misleads an alien about the availability of relief." *Id*. at 99. Accordingly, we found that the BIA's "affirmative misstatements to Lopez that he was not eligible for any relief from deportation functioned as a deterrent to seeking relief." *Id*.

*Lopez* is highly relevant to this case because both Gill and Lopez were incorrectly informed that they were ineligible for § 212(c) relief by the BIA, which functioned as a deterrent to seeking judicial review by way of habeas. 445 F.3d at 92-93. However, we are unable to tell on this record whether *Lopez* governs this case. Lopez was a pro se respondent at the time that he was given incorrect information by the IJ, though he was represented by an accredited representative when he was given this information by the BIA. *Id.* at 97. The availability of relief from the deportation order was exceedingly murky at the time of Lopez's

32

order, which was October 1996, an important factor under *Copeland*. *See*

*Copeland*, 376 F.3d at 69. A statutory provision stated flatly that no appeal was

permitted, *see Lopez*, 445 F.3d at 93, and our decision that habeas review might be

available was not rendered until 1998, *Jean-Baptiste v. Reno*, 144 F.3d 212, 219 (2d

Cir. 1998). *St. Cyr* was not decided until after Lopez had been deported. *See St.*

*Cyr*, 553 U.S. at 289. Moreover, in Lopez's criminal appeal, both Lopez and the

government agreed that the IJ told Lopez that he had a right to appeal to the BIA,

but he was not eligible for *any* relief from deportation, including § 212(c) relief.

*See Lopez*, 445 F.3d at 92-93; Br. for Defendant-Appellant at 8, *United States v.*

*Lopez*, 445 F.3d 90, (2d Cir. 2006), 2003 WL 25445328; Br. & App'x for the United

States at 3-4, *United States v. Lopez*, 445 F.3d 90 (2d Cir. 2006), 2003 WL 25445327.

Gill was represented before the IJ and BIA, but it appears that he was pro

se, as he lacked the financial resources to hire an immigration attorney, and was

detained for most or all of time between the BIA decision and his deportation—

which was the time period during which he theoretically could have filed a

habeas petition.[13] In addition, Gill has asserted that he was informed by his

immigration attorneys (at a minimum, the attorney who represented him until

---

[13] Gill obtained an immigration attorney after he was arrested for illegal reentry.

the BIA affirmed his order of deportation) that further judicial review was

unavailable.[14]

The district court made no factual findings regarding these issues, nor did

it analyze whether seeking habeas review was realistically possible given the

facts of Gill's case.  Therefore, we think that it is appropriate to remand to the

district court for fact-finding and consideration of whether the combination of

the BIA decision and bad legal advice from his lawyer deprived Gill of a

meaningful opportunity for judicial review.

### III.  Fundamental Fairness

Finally, "[f]or an alien to succeed in collaterally attacking his deportation

order, he 'must show . . . that the administrative proceedings were

fundamentally unfair in some respect that would have entitled him to relief on

direct appeal.'"  *Fernandez–Antonia*, 278 F.3d at 157 (quoting *United States v. Fares*,

978 F.2d 52, 57 (2d Cir. 1992)).  To show fundamental unfairness, a defendant

"must show both a fundamental procedural error and prejudice resulting from

---

[14] In considering Gill's explanation for failing to seek habeas review, we note that he has otherwise demonstrated diligence in pursuing administrative and judicial review. Gill's diligent efforts include the following: two successful appeals to the BIA; the appeal to the BIA at issue in the instant case; a motion to reopen to the BIA; a petition for review filed in the Second Circuit; a motion for reconsideration or rehearing en banc in this Court; a motion to dismiss the indictment; and the instant Second Circuit appeal. *See supra* note 2.

that error." *Id.* at 159. In challenging his deportation order under § 1362(d)(3), Gill argued that the BIA's erroneous finding that he was ineligible for § 212(c) relief foreclosed his claim for relief to which he was entitled. The magistrate judge concluded that Gill had not shown a procedural error: it agreed with the BIA that "*St. Cyr* is inapplicable to [Gill]," reasoning that Gill was convicted after a bench trial and therefore he would not have been eligible for § 212(c) relief. App'x 178. Accordingly, without deciding whether Gill was prejudiced, the magistrate judge rejected Gill's argument that his deportation proceedings were fundamentally unfair.

We also remand for findings as to whether, assuming that Gill has satisfied § 1362(d)(2), he was prejudiced by the misinformation as to the availability of habeas relief. *See Copeland*, 376 F.3d at 73-75 (explaining that determining prejudice is akin to "a trial within a trial" in which "[t]he court must first obtain all of the facts relevant to the particular alien and then apply standards established under [§] 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief"). Given the possibility of a future appeal and in the interest of judicial economy, we remand for findings as to the satisfaction of both subsection (2) and

subsection (3), regardless of the outcome of the subsection (2) inquiry. However, the inquiry under subsection (3) may be limited to prejudice because, assuming that subsection (2) is satisfied, a fundamental procedural error would exist. *See Copeland*, 376 F.3d at 70-73.

## CONCLUSION

For the foregoing reasons, the matter is remanded to the district court in accordance with the procedures of *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994), for determination of whether Gill was deprived of the opportunity for judicial review and whether the entry of his deportation order was fundamentally unfair. If it finds that Gill has satisfied the requirements of § 1326(d), the district court should vacate the judgment of conviction and dismiss the indictment.[1] If it finds that Gill has not satisfied these requirements, the judgment of conviction may stand.

---

[1] In the interest of judicial economy, this panel will retain jurisdiction over any subsequent appeal; either party may notify the Clerk of a renewed appeal within fourteen days of the district court's decision. *See Jacobson*, 15 F.3d at 22.